# United States Court of Appeals
## For the First Circuit

No. 11-1481

NESTOR ARAMIZ PEREZ-TRUJILLO,

Petitioner,

v.

MERRICK B. GARLAND,[*]
UNITED STATES ATTORNEY GENERAL,

Respondent.

No. 17-1586

NESTOR ARAMIZ PEREZ-TRUJILLO,

Petitioner,

v.

MERRICK B. GARLAND,[*]
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITIONS FOR REVIEW OF ORDERS OF THE
BOARD OF IMMIGRATION APPEALS

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Merrick B. Garland has been substituted for former Attorney General Eric H. Holder, Jr.

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Merrick B. Garland has been substituted for former Attorney General Jefferson B. Sessions III.

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Gregory Romanovsky and SangYeob Kim, with whom Gilles Bissonnette, Romanovsky Law Offices, and American Civil Liberties Union of New Hampshire were on brief, for petitioner.
Jonathan Robbins, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom Jeffrey Bossert Clark, Acting Assistant Attorney General, Civil Division, and Anthony P. Nicastro, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.
Nancy Kelly and John Willshire-Carrera on brief for Greater Boston Legal Services, amicus curiae.
Deirdre M. Giblin on brief for Massachusetts Law Reform Institute, amicus curiae.

June 28, 2021

**BARRON**, **Circuit Judge**.  At issue are Nestor Perez-Trujillo's petitions for review of two decisions by the Board of Immigration Appeals ("BIA"):  its 2011 ruling affirming the denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"); and its 2017 ruling reversing the grant of his application for adjustment of status.  We deny his 2011 petition and grant his 2017 petition.

## I.

Perez-Trujillo is a native of El Salvador who came to the United States on May 17, 2007, when he was thirteen years old. He was apprehended close to the U.S. border by immigration authorities and, on May 19, 2007, was issued a Notice to Appear for removal proceedings.

Perez-Trujillo timely filed on May 6 of the following year an application for asylum, 8 U.S.C. § 1158,[1] and requested

---

[1] "The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee . . . ." 8 U.S.C. § 1158(b)(1)(A).  A "refugee" for these purposes is defined as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  Id. § 1101(a)(42)(A).

withholding of removal, id. § 1231(b)(3),[2] and relief from removal under the CAT, as implemented by 8 C.F.R. § 1208.16-.18. Perez-Trujillo indicated in doing so that he sought asylum and withholding of removal on the grounds of "political opinion" and "membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A); id. § 1231(b)(3)(A).

Testifying at his removal proceedings in Boston, Massachusetts, on April 16, 2009, Perez-Trujillo stated, among other things, that he had endured several violent encounters in El Salvador with members of the gang MS-13. He testified that gang members had, through violent beatings, forced him to join their ranks; that, when he resisted their orders, gang members responded with further violence; that gang members came looking for him after they heard he had spoken to the police; and that, as he made plans to leave the country and even after he came to the United States, gang members continued to search for him. He also testified that he feared that he would be killed by members of the gang if he returned to El Salvador. To further support his arguments in support of asylum, withholding of removal, and protection under

---

[2] Subject to exceptions not relevant here, "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

- 4 -

the CAT, Perez-Trujillo also submitted a number of reports and articles concerning conditions in El Salvador.

The immigration judge ordered Perez-Trujillo's removal after denying his application for asylum as well as his request for withholding of removal and protection under the CAT. Perez-Trujillo appealed that ruling to the BIA, and the BIA upheld the order of removal in April 2011. Perez-Trujillo thereafter filed a petition for review from that decision in this Court. We heard oral argument in September 2012.

While Perez-Trujillo was challenging his removal on the grounds just described, he also filed a petition for a "special immigrant" visa. See 8 U.S.C. §§ 1101(a)(27)(J), 1153(b)(4).[3] Such a visa makes one eligible to apply for adjustment of status -- a process through which the Attorney General may make a discretionary determination to adjust a noncitizen's status to that of a lawfully admitted permanent resident. Id. § 1255(a), (h).

---

[3] The Immigration and Nationality Act provides that the term "special immigrant" includes one who, among other things, "has been declared dependent on a juvenile court located in the United States . . . and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law" and "for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence." 8 U.S.C. § 1101(a)(27)(J)(i)-(ii). "Certain special immigrants" are eligible for a particular pool of visas. See id. § 1153(b)(4).

Following oral argument in our Court on Perez-Trujillo's 2011 petition and while it was still pending with us, the U.S. Department of Homeland Security ("DHS") granted Perez-Trujillo's application for a special immigrant visa on October 1, 2012. Accordingly, on November 1, 2013, we remanded his 2011 petition to the BIA, while retaining jurisdiction over it, so that Perez-Trujillo could seek adjustment of status or administrative closure.

On March 23, 2016, a new immigration judge granted Perez-Trujillo's application for adjustment of status, finding that, after balancing "all of the negative and positive factors" in his case, "the scale tip[ped] in [his] favor." The government then appealed that ruling to the BIA, which reversed it on May 12, 2017. The BIA concluded that Perez-Trujillo had "not shown sufficient equities to overcome his criminal history." Perez-Trujillo filed a petition for review of the BIA's ruling in our Court on June 6, 2017.

Several years later, on May 6, 2020, new counsel was appointed to represent Perez-Trujillo on a pro bono basis. We consolidated the 2011 and 2017 petitions and ordered supplemental briefing on the issues presented in both. Before us now, then, are both the 2011 petition for review, which concerns the BIA's ruling affirming the denial of Perez-Trujillo's applications for asylum, withholding of removal, and CAT relief; and the 2017

petition for review, which concerns the BIA's reversal of the ruling granting his application for adjustment of status. We address each of these petitions for review in turn.

## II.

With respect to Perez-Trujillo's 2011 petition for review, we first consider his challenge to the BIA's affirmance of the immigration judge's denial of his asylum and withholding of removal claims. We then take up his challenge in that petition for review to the BIA's affirmance of the immigration judge's denial of his CAT claim. As we will explain, we find that there is no merit to any of these challenges.

## A.

To be eligible for asylum, Perez-Trujillo "must show that [he] is unwilling or unable to return to [his] country because of 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Pojoy-De León v. Barr, 984 F.3d 11, 16 (1st Cir. 2020) (quoting Diaz Ortiz v. Barr, 959 F.3d 10, 16 (1st Cir. 2020)). Perez-Trujillo initially applied for asylum based on both "political opinion" and "membership in a particular social group." See 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). Before us, however, he pursues the "particular social group" claim only, and so that is the only one that we address. See Kelly v. Riverside Partners, LLC, 964 F.3d 107, 115 (1st Cir. 2020)

- 7 -

(concluding that appellant waived a challenge by failing to argue it on appeal).

Perez-Trujillo argues that the BIA's ruling affirming the immigration judge's denial of his application for asylum cannot stand because the BIA both treated him as having sought asylum based on his membership in a "particular social group" defined as "witnesses who openly reported . . . gang activity to the police" and then erred in holding that such a group is not a legally cognizable one. In so arguing, Perez-Trujillo contends that it is of no moment that he did not actually assert to the BIA, or the immigration judge, that he was a member of a particular social group so defined. All that matters, he asserts, is that the BIA mistakenly proceeded on a different understanding of the characteristics of the "particular social group" in which he was claiming to have been a member and then wrongly ruled based on that mistaken understanding that such a group is not a "particular social group" at all.

Perez-Trujillo premises this aspect of his challenge on the fact that the BIA stated in its opinion that he "indicated that he believes that he was targeted by the gangs for recruitment because he informed on an MS-13 member," and then pointed out that the immigration judge, "[b]y way of analogy, . . . noted that the First Circuit has held that informants to the United States government working against a drug smuggling ring[] lacked social

visibility." But, we do not read these passages to support his contention that the BIA treated him as having claimed membership in a witnesses-based "particular social group." Right after making that statement, the BIA upheld the immigration judge's finding "that the respondent's social group does not have social visibility, . . . is indeterminate, and . . . is drawn from the fact that its members have been targeted for persecution" by quoting from the portion of the immigration judge's opinion that clearly addresses only the "particular social group" which Perez-Trujillo concedes is the only one of which he did claim to be a member -- namely, the group consisting of "young Salvadoran male students initiated into gangs against their will who refuse to carry out gang orders and who leave the gang by fleeing the country." And because we conclude that the government is right that the BIA addressed -- and rejected -- Perez-Trujillo's claim of asylum based on his "membership in a particular social group" solely on the understanding that his proposed group was that one and that one alone, we also agree that the government is right that we have no jurisdiction to address whether he might have any ground for seeking asylum based on his membership in any other group, including the one involving witnesses that he contends that the BIA wrongly deemed not to be a legally cognizable one. See Samayoa Cabrera v. Barr, 939 F.3d 379, 383-84 (1st Cir. 2019).

We turn, then, to Perez-Trujillo's separate contention that the BIA erred in rejecting his claim of asylum based on his membership in the group that we have just referenced and in which he did plainly claim membership before both the immigration judge and the BIA: young, male, Salvadoran students who are forcibly recruited into gangs, refuse gang orders, and leave the gang. Here, too, though, we conclude that there is no merit to his challenge to the BIA's ruling affirming the immigration judge's denial of his application for asylum.

A proposed "particular social group" must satisfy three requirements to qualify as one: immutability, particularity, and visibility. See De Pena-Paniagua v. Barr, 957 F.3d 88, 95-96 (1st Cir. 2020). The "immutability" requirement is satisfied if the members of the group "share a common immutable characteristic." Id. at 96 (quoting Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015)). "Particularity" requires that the group have "definable boundaries" and that it not be "amorphous, overbroad, diffuse or subjective." Ramírez-Pérez v. Barr, 934 F.3d 47, 51 (1st Cir. 2019) (quoting Paiz-Morales, 795 F.3d at 244). Finally, the "visibility" requirement is met if members of the group are "socially distinct within the society in question," De Pena-Paniagua, 957 F.3d at 96 (quoting Paiz-Morales, 795 F.3d at 244), which means the group is "external[ly] perce[ived] . . . within a

given society," id. at 95 (third alteration in original) (quoting Matter of M-E-V-G-, 26 I. & N. Dec. 227, 236 (B.I.A. 2014)).

The government urges us to uphold the BIA's ruling affirming the immigration judge's denial of Perez-Trujillo's claim of asylum based on his membership in this claimed "particular social group" based on our prior decision in Larios v. Holder, 608 F.3d 105 (1st Cir. 2010). There, we denied the petitioner's claim that "young Guatemalan men recruited by gang members who resist such recruitment" constitute a valid particular social group. Id. at 108. We explained that a particular social group "must be generally recognized in the community as a cohesive group" and that the petitioner there "ha[d] 'failed to provide even a scintilla of evidence to this effect.'" Id. at 109 (quoting Mendez-Barrera v. Holder, 602 F.3d 21, 26 (1st Cir. 2010)). The government contends that Larios supports the BIA's ruling, given that it, too, relies on a finding that the evidence did not suffice to show that the claimed "particular social group" possessed the requisite "social visibility."

Reviewing de novo, see Aguilar-De Guillen v. Sessions, 902 F.3d 28, 33 (1st Cir. 2018), we agree with the government that Perez-Trujillo's case is not appreciably stronger than the petitioner's in Larios. Perez-Trujillo does identify evidence in the record that indicates that he personally was known within El Salvador to have been a former member of the gang and to have

- 11 -

resisted pressure by the gang to remain a member of it. He also points to evidence in the record that bears on whether those thought to be affiliated with gangs generally -- and, more specifically, those who are former gang members -- are socially visible within El Salvador. But, Perez-Trujillo does not argue that he is entitled to asylum on account of his status as a former gang member, which is understandable given our precedent. See Cantarero v. Holder, 734 F.3d 82, 86 (1st Cir. 2013) (upholding the BIA's rejection of the particular social group consisting of former members of the 18th Street gang after determining that "[t]he BIA reasonably concluded that . . . Congress did not mean to grant asylum to those whose association with a criminal syndicate has caused them to run into danger"). And, with respect to the more narrowly defined proposed group on which his asylum claim does rely, he has failed to identify any evidence in the record that this specific group -- young, male, Salvadoran students who are forcibly recruited into gangs, refuse gang orders, and desert the gang -- is itself socially visible in El Salvador. See Perez-Rabanales v. Sessions, 881 F.3d 61, 66 (1st Cir. 2018) (explaining that the visibility requirement "turns on 'whether members of a particular group "are set apart, or distinct, from other persons within the society in some significant way"'" (quoting Vega-Ayala v. Lynch, 833 F.3d 34, 39 (1st Cir. 2016))); see also Carvalho-Frois v. Holder, 667 F.3d 69, 73 (1st Cir. 2012)

- 12 -

("[T]he relevant question is 'whether the social group is visible in the society, not whether the alien herself is visible to the alleged persecutors.'" (quoting Mendez-Barrera, 602 F.3d at 27)).

Thus, because Perez-Trujillo has not shown that his proposed group is "generally recognized in the community as a cohesive group," Larios, 608 F.3d at 109 (quoting Mendez-Barrera, 602 F.3d at 26), we must deny his 2011 petition for review as to his application for asylum. And, that being so, we must also deny his petition with respect to his application for withholding of removal. See Thile v. Garland, 991 F.3d 328, 336 (1st Cir. 2021).

**B.**

We next consider Perez-Trujillo's challenge to the BIA's affirmance of the immigration judge's denial of his application for CAT protection. To prevail on his CAT claim, Perez-Trujillo was required to show by a preponderance of the evidence that, if returned to El Salvador, "he would be subject to torture 'by or with the acquiescence of a government official.'" Aldana-Ramos v. Holder, 757 F.3d 9, 19 (1st Cir. 2014) (quoting Nako v. Holder, 611 F.3d 45, 50 (1st Cir. 2010)). Acquiescence includes willful blindness. See Ramírez-Pérez, 934 F.3d at 52. We review the BIA's denial of his claim under a two-tiered standard, determining whether factual findings are supported by substantial evidence and

- 13 -

reviewing legal questions de novo. See Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004).[4]

The BIA did not take issue with Perez-Trujillo's contention that he would suffer harm sufficiently severe to constitute torture if he were to return to El Salvador, and the record contains ample evidence from which the BIA could so find. In addition to his own testimony about the beatings he endured in El Salvador at the hands of gang members and the threats to which they have subjected him since he left that country, Perez-Trujillo introduced country reports indicating that former gang members in general face a heightened risk of encountering violence.

For example, one report, from the International Human Rights Clinic at Harvard Law School, states that "whereas in the past it [had been] difficult, but feasible, for a gang member to

---

[4] The government contends that Perez-Trujillo waived his CAT claim by failing to raise it in his 2011 petition for review and raising it for the first time in his opening supplemental brief, which was filed in 2020. There is no jurisdictional bar to our considering this claim, because the BIA addressed it. See Mazariegos-Paiz v. Holder, 734 F.3d 57, 63 (1st Cir. 2013). And, while we are generally reluctant to entertain "arguments not raised in a party's initial brief," treating them as waived "except in extraordinary circumstances," United States v. Pizarro-Berríos, 448 F.3d 1, 5 (1st Cir. 2006), here, we ordered supplemental briefing when we consolidated these appeals, and Perez-Trujillo raised the CAT claim in his opening supplemental brief. The government had a full opportunity to respond to his CAT claim on the merits in its own supplemental brief, filed nearly a month after Perez-Trujillo's. We thus "perceive no possibility of prejudice" to the government "and, accordingly, excuse any waiver by" Perez-Trujillo, United States v. Rodríguez-Rosado, 854 F.3d 122, 125 n.3 (1st Cir. 2017), and so proceed to the merits.

disassociate himself safely from a gang," as of 2007, it was "virtually impossible" to do so. The report also states that "[g]angs' methods of recruitment, and the sanctions they impose on members who demonstrate disloyalty or who attempt to withdraw from active gang life, are increasingly violent," and that "[t]hose who were once part of gang life and decide to change their life paths face severe consequences; gangs consider abandoning the gang as a betrayal that justifies a death sentence." Indeed, one individual interviewed for the report recounted that "killing people who left the gang was part of the initiation for new gang members." The same report explains that there was a "consensus among those [who were] interviewed that joining a gang is a life commitment" and that, while migrating is sometimes a way in which an individual can leave a gang, "those gang members who leave the gang and migrate to the United States face very serious threats to their safety if they are deported back to El Salvador."

Perez-Trujillo also submitted another report, from the Immigration and Refugee Board of Canada. It summarizes a study that found that "a new [MS-13] recruit becomes a full-fledged member by 'teaching a lesson' to a member trying to dissociate from the gang" and quotes a young man who, when initiated into MS-13 at age thirteen, was told that "[t]he only way out is death." He submitted as well an article from the Financial Times that stated that "desertion [from MS-13] is punishable with death."

Nonetheless, the BIA rejected Perez-Trujillo's CAT claim on the ground that the immigration judge did not err in finding that he had failed to meet his burden to show that any harm that he might suffer in El Salvador would be "at the instigation or with the acquiescence (to include the concept of willful blindness) of a government official." See 8 C.F.R. § 208.18(a)(1). To support that ruling, the BIA "note[d] that difficulty controlling gangs is not the same as acquiescing in gang activities" and found that the evidence Perez-Trujillo had submitted, "including his testimony" and "background documents," "d[id] not show that anyone in the El Salvadoran government likely would affirmatively consent or turn a blind eye to his torture."

Perez-Trujillo challenges this conclusion in part based on an affidavit that he submitted to the immigration judge. It describes an incident in which MS-13 members allegedly beat him and forced him to board a bus and demand money from the driver; the police came; Perez-Trujillo was arrested; he tried to explain to the police why he had been on the bus; the police "called [him] a liar and said [he] was a member of the MS-13"; and the police continued to accuse him of lying, threatened him, and jailed him even after he denied he was a member of that gang.

This affidavit, however, does not provide a basis for our overturning the BIA's finding as to acquiescence. The BIA could have accepted the affidavit as credible and still reasonably

- 16 -

concluded that the police disregarded Perez-Trujillo's assertions that he was not a gang member because the officers did not believe his story and thought that he was simply trying to evade arrest rather than because they were willfully blind toward the gang's abuse of him. Indeed, the fact that the officers were even investigating what they apparently believed to be gang activity cuts against Perez-Trujillo's assertion that the police in El Salvador acquiesce in gang violence.

Perez-Trujillo separately attempts to support his challenge to the BIA's acquiescence ruling by pointing to testimony that he provided in his immigration proceedings that there were other instances in which Salvadoran officers accused him of being a gang member despite his protestations to the contrary. But, it does not follow from skepticism by the officers of Perez-Trujillo's insistence that he did not belong to MS-13 that law enforcement in El Salvador is likely to turn a blind eye if MS-13 members attempt to torture him.

Perez-Trujillo next points to evidence in the record concerning an incident in which he provided the Salvadoran authorities with information about the location of an MS-13 member who had left a threatening voicemail on his phone following his forcible initiation. Perez-Trujillo emphasizes that the authorities neither prosecuted the member nor arrested any other MS-13 members based on his tip. However, even where "efforts at

managing gang activity [are not] completely effectual," that is insufficient to sustain a CAT claim unless the record "compel[s] a conclusion that the government has acquiesced in gang activities." Mayorga-Vidal v. Holder, 675 F.3d 9, 20 (1st Cir. 2012); see also Cantarero, 734 F.3d at 87. And, we cannot conclude that the evidence of this isolated incident meets that bar, at least given the countervailing evidence of governmental efforts to combat violence in El Salvador, including a report from the U.S. Agency for International Development describing a "hard-line" strategy by that government that is "aimed at incarcerating gang members involved in criminal activity." See Cantarero, 734 F.3d at 87; Mediouni v. INS, 314 F.3d 24, 28 (1st Cir. 2002) (explaining that where the record "may permit [one] inference" but "does not compel it," the record does not "require[] us to substitute our judgment for the [BIA's] . . . pursuant to the substantial evidence standard of review").

We are similarly unpersuaded by Perez-Trujillo's contention that the evidence of the country conditions that he submitted compels us to overturn the BIA's ruling as to acquiescence. He highlights the Harvard report described above, which states that gangs like MS-13 "are operating with growing sophistication and impunity in El Salvador," that gangs are responsible for close to one in five homicides in El Salvador, and that the police forces "abandon their posts and disappear when

gang members take to the streets." He also emphasizes that the same report indicates both that "this violence is 'often encouraged by the police,' especially when the victims are suspected gang members," and that the government in El Salvador "frequently fails to investigate and prosecute violence in which the victim is . . . presumed to be a gang member." But, while Perez-Trujillo argues that the BIA ignored these reports in ruling as it did as to acquiescence, the BIA expressly stated in its opinion that it considered "background documents such as State Department Country Reports" that he submitted. See Li Sheng Wu v. Holder, 737 F.3d 829, 833 (1st Cir. 2013) ("[T]he BIA is not required 'to dissect in minute detail every contention that a complaining party advances,' or to discuss each piece of evidence proffered." (citation omitted) (quoting Raza v. Gonzales, 484 F.3d 125, 128 (1st Cir. 2007))).

Nor are we persuaded by his assertion in his supplemental briefing to us that the reports that he submitted -- at least when viewed in combination with the other record evidence on which he relies that we have described above -- compel a conclusion as to governmental acquiescence contrary to the one that the BIA reached. The bulk of the evidence on which he relies concerns official tolerance of violence against gang members, rather than of violence against former gang members like himself. Cf. Rosales Justo v. Sessions, 895 F.3d 154, 165 (1st Cir. 2018) (explaining, in the

- 19 -

context of evaluating whether the government was unable to protect the petitioner from persecution, that "[a]lthough in some cases country condition reports can be too generalized," they were "particularly probative" there "because they closely mirrored the specific circumstances" of the petitioner).  In addition, as we have noted, the record contains evidence that the government of El Salvador has made efforts to crack down on gang violence.  Thus, Perez-Trujillo has not explained how the evidence that he highlights -- in the context of the record as a whole -- suffices to compel a different finding as to acquiescence from the one that the BIA made.  See Mendez-Barrera, 602 F.3d at 28 ("Although [country conditions] reports are sometimes helpful to [a CAT] claim, their generic nature is such that they are rarely dispositive.").

Finally, we are not persuaded by Perez-Trujillo's argument that the BIA incorrectly applied the willful blindness standard in resolving this claim.  Perez-Trujillo argues that the BIA's statement that "difficulty controlling gangs is not the same as acquiescing in gang activities" suggests that the BIA concluded that "if the national-level government is making any effort to control the gang activities," a CAT applicant cannot establish acquiescence.  But, in context, it is clear that the agency's statement about evidence regarding the government's "difficulty controlling gangs" was just a description of a subset of the

- 20 -

evidence Perez-Trujillo had submitted and an accurate conclusion that such evidence does not suffice to establish acquiescence. See Mayorga-Vidal, 675 F.3d at 20.

### III.

Having found no merit to any of the challenges that Perez-Trujillo advances in his 2011 petition for review in support of his asylum, withholding of removal, and CAT claims, we now turn to the 2017 petition. Here, Perez-Trujillo challenges the denial of his application for adjustment of status.

Perez-Trujillo argues that the BIA committed legal error in two respects in overruling the immigration judge to deny his application for adjustment of status. First, he contends that the BIA failed to consider the hardship that he would suffer if he were forced to return to El Salvador, which he argues is a "mandatory factor" that the BIA must consider under its precedent. Second, he argues that the BIA applied the incorrect standard of review to the immigration judge's factual determinations.

The government responds first by contending that we lack jurisdiction to review Perez-Trujillo's claims. Because we reject that contention, we then move on to address its merits-based arguments for upholding the BIA's ruling. As we will explain, here, too, we are not fully persuaded by them.

A BIA decision denying adjustment of status is a discretionary determination. See 8 U.S.C. § 1255(a); Jaquez v. Holder, 758 F.3d 434, 435 (1st Cir. 2014). As such, we have no jurisdiction to consider a petition for review challenging such a decision, see 8 U.S.C. § 1252(a)(2)(B)(i), except to the extent that the petition raises "constitutional claims or questions of law," id. § 1252(a)(2)(D). See also Jaquez, 758 F.3d at 435.

The government argues that although Perez-Trujillo "purports to raise legal claims, it is apparent that he is actually attempting to challenge the way the agency weighed the various factors." But, Perez-Trujillo's first argument in his 2017 petition is that the BIA's past precedent in Matter of Arai, 13 I. & N. Dec. 494 (B.I.A. 1970), requires the agency to consider the hardship an individual will suffer if denied adjustment of status and that it failed to do so here. And, an argument that the BIA has "departed from its settled course of adjudication" in the process of making a discretionary determination is a type of legal challenge that we have previously reviewed. See Thompson v. Barr, 959 F.3d 476, 490 (1st Cir. 2020). We thus see no basis for concluding that Perez-Trujillo's first argument is not a legal one

insofar as it is premised on the contention that the BIA failed to consider a factor it was legally required to consider.[5]

**B.**

Turning to the merits, then, we must determine whether Perez-Trujillo is right in arguing not only that, in light of Matter of Arai, the BIA was required to consider in an individualized manner the hardship that he might suffer if he were required to return to El Salvador but also that the BIA then failed to undertake such consideration in reversing the immigration judge's grant of his application for adjustment of status.[6] Notably, in responding to this contention, the government takes no issue with Perez-Trujillo's contention that Matter of Arai required the BIA to consider individualized hardship in his case.

------

[5] The government also relies on our case law holding that we lack jurisdiction over a petition that could be read to include legal claims if those claims are "not colorable." See Elysee v. Gonzales, 437 F.3d 221, 224 (1st Cir. 2006). To the extent that Perez-Trujillo's claims can be construed as legal ones, the government argues, they are "meritless and belied by the record." But, that is simply a contention that his claims ought to fail on the merits -- a contention that, as we will next explain, we reject -- and so provides no reason for us to conclude that we lack jurisdiction.

[6] The government contended at argument that the BIA's decision tracked all of the favorable factors that Perez-Trujillo raised in his brief before the agency. To the extent that the government intended to suggest Perez-Trujillo has waived the argument that he faces an individualized risk of harm in El Salvador, we note that in his brief to the BIA Perez-Trujillo highlighted the evidence supporting the "actual harm" he would face in that country and the circumstances that gave rise to his departure.

- 23 -

Rather, it focuses its response on a contention that the BIA in fact did all that was required here under that prior BIA precedent with respect to consideration of the individualized hardship factor.

The government is right that the BIA did account for Perez-Trujillo's family ties to the United States and lack of any to El Salvador, his other ties to this country that would be severed if he were removed there, as well as what the government describes as the "potential problems of returning to a country with a high level of crime and violence." So, this is not a case in which the BIA failed to consider hardship at all in determining that the equities failed to support an application for adjustment of status.

But, we do not understand Perez-Trujillo to contend merely that the BIA erred as a matter of law because it failed to engage in any hardship inquiry. We understand him to be arguing that it erred as a matter of law because it ignored altogether a particularly salient aspect of the hardship showing that he was trying to make -- namely, that he in particular was at risk of suffering severe physical harm in El Salvador by virtue of being a former gang member if he were to be removed to that country.

The government develops no argument that such a failure would not constitute a legal error, insofar as Matter of Arai mandates an individualized hardship inquiry. Nor, as we have

noted, does the government dispute that <u>Matter of Arai</u> mandates that inquiry. Thus, the key issue concerns whether the BIA did in fact consider the evidence of hardship that Perez-Trujillo contends that it ignored. We cannot agree that it did.

With the possible exception of the portion of the BIA's opinion that references the "level of crime and violence" in El Salvador, nothing in that opinion indicates that the BIA considered any of the evidence that Perez-Trujillo submitted in support of that critical aspect of his attempt to show hardship in defending the immigration judge's grant of his adjustment of status application based on the equities. Rather, at least if we set that portion aside for the moment, the opinion merely shows that <u>other</u> aspects of Perez-Trujillo's hardship case were considered.

The government did contend for the first time at oral argument that the BIA's express acknowledgment in its opinion that the immigration judge had considered that Perez-Trujillo's "return to El Salvador will be <u>particularly</u> dangerous given the level of crime and violence in that country," (emphasis added), is best understood as an assessment by it of the dangers that Perez-Trujillo in particular faces upon his return to that country. And, the government went on to suggest, the BIA thus should be read to have considered the evidence at issue and merely failed to give it the weight that Perez-Trujillo would wish.

The problem with this contention, though, is that it ignores the "given the level of crime and violence in that country" qualifying language in the quoted passage. That qualifying language prevents us from concluding that the BIA in noting that returning to El Salvador would be "particularly dangerous" for Perez-Trujillo was considering the unique threat to his physical well-being that he contended that he faces due to his past gang membership. Rather, that qualifying language appears to indicate that the BIA was considering only the general danger that anyone would face in that country due to "the level of crime and violence in that country."

In consequence, we cannot agree with the government that the BIA gave any consideration in connection with its hardship inquiry to whether El Salvador would be dangerous for Perez-Trujillo in particular, given the special risk that he faces of being severely harmed due to his past gang membership. And that failure is especially concerning given that, as we have explained, the record contains substantial evidence to that effect, including not only evidence concerning the lengths to which the gang that he testified he had been forced to join while in El Salvador had gone to pursue him even after he had left that country but also the country reports' representations concerning the risks of harm that former gang members face from the gangs they have left. Indeed, we note in this regard that DHS has granted Perez-Trujillo a

special immigrant visa based on a state-court finding that it "would not be in [his] best interest to be returned" to El Salvador, see 8 U.S.C. § 1101(a)(27)(J)(ii), and that the immigration judge, relying in part on the state-court finding indicating that Perez-Trujillo "has been unable to reunify with one parent due to abuse, neglect, or abandonment," found that, after "taking into consideration all of the negative and positive factors . . . , the scale tips in [Perez-Trujillo's] favor."

To be sure, the government is right that we have no jurisdiction to re-weigh the evidence of hardship. But, a re-weighing could only occur if there had been a weighing of that evidence in the first place. And, here, we conclude that there was no weighing of that evidence at all. We thus reject the government's argument that the BIA, in overturning the immigration judge's ruling granting Perez-Trujillo adjustment of status, did consider hardship as he contends that it was required to do under Matter of Arai. And, as the government offers no argument as to how the BIA's ruling may be sustained notwithstanding that failure on its part, we must vacate and remand it for further consideration. See, e.g., Mukamusoni v. Ashcroft, 390 F.3d 110, 120 (1st Cir. 2004) (finding that "[t]he BIA committed errors of law and misapplied the law by," among other things, "focusing narrowly on only parts of the record that supported its decision"); see also Aldana-Ramos, 757 F.3d at 18-19, 18 n.7 (remanding where

the BIA had not grappled with salient evidence in the explanation it provided for its decision).

## IV.

Perez-Trujillo's 2011 petition is denied, but his 2017 petition is granted. We thus vacate the BIA's 2017 decision overturning the ruling by the immigration judge granting him adjustment of status and remand it to the agency for further proceedings.